UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **MOUNTASSER HACHEM,** ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | |
| ) | |
| **NADINE B. ABOUSHAKRA, a/k/a/** ) | Case No. _____ |
| **NADINE BARAKAT,** ) | |
| ) | **JURY TRIAL DEMANDED** |
| *Serve*: Nadine B. Aboushakra ) | |
| 3961 Highland Oaks ) | |
| Fairfax, Virginia 22033 ) | |
| ) | |
| *Defendant*. ) | |

**COMPLAINT**

NOW COMES Plaintiff, MOUNTASSER HACHEM, by and through his attorneys, and for his Complaint against Defendant, NADINE B. ABOUSHAKRA, a/k/a NADINE BARAKAT, states as follows:

**PARTIES**

1. The Plaintiff, Mountasser Hachem ("Plaintiff"), is a citizen of Lebanon who currently lives in Dubai, United Arab Emirates. He is the Founder and CEO of Monty Mobile Limited, a United Kingdom-based company with corporate offices in Beirut, Lebanon. Monty Mobile Limited is the parent company of multi-national entities, including Monty Holding s.a.l., a Lebanese holding company, and Monty Mobile. Mr. Hachem has recently also purchased a financial institution in Lebanon and established other fintech companies.

2. The Defendant, Nadine B. Aboushakra, a/k/a Nadine Barakat ("Defendant"), is a citizen and resident of the Commonwealth of Virginia who resides at 3961 Highland Oaks in

Fairfax, Virginia. Defendant speaks fluent Arabic and upon information and belief, is also Lebanese.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because there is complete diversity between Plaintiff (who lives in the United Arab Emirates) and Defendant (who lives in Virginia), and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

4. This Court has personal jurisdiction over Defendant, and venue is proper in the Eastern District of Virginia, pursuant to 28 U.S.C. § 1391(b)(1), as Defendant resides within this judicial district.

5. This matter is brought in the proper division pursuant to Local Civil Rules 3(B) and 3(C) as the Defendant resides in Fairfax, Virginia, within the Alexandria Division.

## FACTUAL BACKGROUND

6. Plaintiff brings this lawsuit against Defendant for claims of (i) defamation, (ii) defamation *per se*, (iii) insulting words, and (iv) intentional infliction of emotional distress.

7. Defendant's conduct underlying Plaintiff's claims began in March 2024. At that time, and for unknown reasons, Defendant began an unrelenting, defamatory social media campaign against Plaintiff. Upon information and belief, Defendant has worked with others to systematically and repeatedly defame Plaintiff from multiple social media accounts and platforms.

**A.  Defendant Used Her Social Media Accounts to Spread Untrue Claims About Plaintiff.**

8. Defendant utilized X, Facebook, and Instagram as forums for her defamatory and malicious untruths.

9. Defendant operates a public X profile (formerly known as a Twitter profile) with the username @Barakat4Nadine and has over 11,000 followers. Her profile information is shown below:



*See* https://x.com/Barakat4Nadine (last accessed July 12, 2024).

10. Defendant also operates a Facebook page under the name "Nadine Barakat." Her Facebook page has approximately 23,000 followers and is described as a "[s]afe space for Whistleblowers!" and a place to "[n]am[e] & [s]ham[e] corrupt & criminals in Lebanon." Her profile information is shown below and identifies both her X username and her Instagram username as identified herein.



*See* https://www.facebook.com/nadine.barakataboushakra (last accessed July 10, 2024) (redacting the identify of individuals other than Defendant).

11. Defendant's posts containing the speech forming the basis of Plaintiff's claims ("the Offending Speech") are attached hereto as Exhibit A (composite of Defendant's X posts), Exhibit B (composite of Defendant's Facebook posts), and Exhibit C (composite of Defendant's Instagram posts), along with their respective translations from the as-posted Arabic to English.

12. Through these accounts, Defendant frequently posts in Arabic to a largely Lebanese audience concerning matters of political and business importance in Lebanon – including corruption allegations and rumors. Defendant styles her online persona as a "teller of uncomfortable truths" within the tight-knit Lebanese business community, akin to "Wikileaks." In this world, allegations are as good as proof.

13. Defendant fashions herself (and is recognized by her followers) as an activist and one willing to speak "truth" (as she defines it) to power. In fact, in May 2024, Defendant bragged on her TikTok account that she is the "head of a gang" committed to the so-called "truth."

14. In the Offending Speech, Defendant falsely accuses Plaintiff of (1) defrauding Plaintiff's companies' and their investors, (2) laundering money for the Iranian Revolutionary Guard and illegally accepting loans from Iranian banks and then recording the funds as profits, (3) laundering money for or otherwise engaging in illegal financial transactions with Lebanon's Prime Minister, and (4) committing bank fraud, among other alleged criminal activity. Each of Defendant's claims in the Offending Speech is false.

15. Defendant's Offending Speech was knowingly false or made with reckless disregard for the reliability of the accusations. There can be no question that Defendant made these statements with knowledge of the foreseeable, devastating harm to Plaintiff's personal and professional reputation.

**B.  Defendant Falsely Accuses Plaintiff of Defrauding Investors.**

16. In April 2024, Defendant falsely accused Plaintiff of defrauding his companies' and their affiliates' investors by misrepresenting the nature of his companies.

17. Specifically, Defendant referred to Plaintiff's companies as "dummy" corporations, in contrast to how those companies were represented to major investors. *See* Exhibit A, at 3–6; Exhibit B, at 1–2.

18. Plaintiff has never defrauded investors of any of his companies or their affiliates. Furthermore, there is no evidence to suggest that such misconduct occurred.

19. Plaintiff has also claimed that Plaintiff's companies are in severe financial distress, have unserviceable levels of debt, and have reported false profits, contrary to what Plaintiff has told his investors. *See* Exhibit A, at 3.

20. Plaintiff has never engaged in such activity and has neither been investigated for nor convicted of such activity by any governing body.

**C.    Defendant Falsely Claims Plaintiff is Laundering Money for the Iranian Revolutionary Guard.**

21. Defendant falsely accused Mr. Hachem of laundering money for the Iranian Revolutionary Guard (a branch of Iran's Armed Forces) by creating a "front" company.

22. In April 2024, Defendant posted on X that Plaintiff "is the screen of the Iranian Guard . . . he is one of the businessmen [who] relied on . . . #money_laundering resulting from the cash economy." Exhibit A, at 3–6.

23. In a series of posts on X and Facebook in April 2024, Defendant falsely accused Plaintiff of "benefit[ing] from #huge_loans from Islamic banks to #Iranian_Revolutionary_Guard in #the Gulf and he recorded these funds as 'profits' in #dummy_corporations in #Europe and Lebanon." Exhibit A, at 3–6; Exhibit B, at 1–2.

24. Plaintiff's statements concerning the financial status of Defendant's companies are false, and Plaintiff has no relationship with the Iranian Revolutionary Guard, business or otherwise. Neither Plaintiff nor any of his companies have accepted loans from Iranian banks.

25. Defendant cites no evidence whatsoever to suggest that any of this claimed illegal conduct occurred. This is because Defendant cannot do so.

26. Plaintiff has never engaged in such activity and has neither been investigated for nor convicted of such activity by any governing body or agency.

**D.     Defendant Falsely Claims Plaintiff is Laundering Money and Engaging in Illegal Activity for Lebanon's Prime Minister.**

27.     In April 2024, Plaintiff falsely accused Plaintiff of laundering money and other illegal financial transactions with or on behalf of Lebanon's Prime Minister. *See* Exhibit A, at 3–6, 19–20; Exhibit B, at 3–4; Exhibit C, at 1–6. Such claims are patently false.

28.     In an attempt to add credibility to these wild, baseless accusations, Defendant claimed to have spoken with specific "sources" and to have unidentified documents as support. *See* Exhibit A, at 7–8, 13–16. These vague references to unsupported and unidentified "sources" cloak her Offending Speech in a veneer of veracity, when, in fact, there is none.

29.     For example, in support of her claims involving Lebanon's Prime Minister, Defendant posted on X that "[a]ccording to sources," Plaintiff "is the screen of #Money laundering," and "[t]he source" stated "Mountasser Hachem and his several companies [are] the screen for the Lebanese Banks and families[,] [the Lebanese Prime Minister] . . . among them." Exhibit A, at 7–8, 13–14.

30.     Defendant's harassment continued without provocation. In April 2024, Defendant falsely accused Plaintiff of bank fraud, accepting "black money," and of general criminality in a series of posts. Exhibit A, at 3–6; Exhibit B, at 3–4.

31.     Plaintiff has, of course, never been charged or convicted of *any* crime nor has he received money from illegal sources as implied by Defendant.

32.     With reference to other unidentified sources, misleading videos, and alleged evidence, Defendant also falsely accused Plaintiff of specific allegations of money laundering. These allegations are wholly false.

E.     **Defendant Posted Reports of Plaintiff's Movements to Further Harass Him.**

33.    In addition to crafting her own "truths," Defendant also utilized her social media platforms to spread harassing content posted by other users.

34.    For example, in late April 2024, a Lebanon-based X account with the username @LebanonJets began tracking any plane on which Plaintiff flew and posting his real-time location in violation of X's user rules.

35.    For several months, that X account posted Plaintiff's real-time location along reposting Defendant's false allegations, and Defendant would likewise repost Plaintiff's location (via @LebanonJets) alongside her Offending Speech.

36.    @LebanonJets' sole purpose appeared to be posting Plaintiff's and others' personal information – which Defendant would then further disseminate. Those posts put Plaintiff and his family at direct risk, requiring the hiring of security personnel during certain business trips, causing him and his family to relocate to Dubai, as well as causing significant emotional distress, including extreme anxiety, trouble sleeping, mood issues, and lessened appetite.

37.    Defendant purposefully and knowingly spread @LebanonJets' harassing posts in tandem with her Offending Speech, putting Plaintiff's safety at risk and causing him emotional distress.

38.    In addition, Defendant posted images depicting Plaintiff's personal plane's identification number, allowing Plaintiff to be tracked. *See* Exhibit C, at 5–8.

39.    It was reasonably foreseeable to Defendant that reposting Plaintiff's real-time location alongside posts accusing him of theft, money laundering, association with terrorism or terrorists, misleading the public and his investors, and general fraud and criminality would put Plaintiff in immediate danger, while also causing significant emotional distress.

40. Put simply, Defendant falsely accused Plaintiff of widespread and specific criminal acts *while pointing the public to his real-time location.*

**F.     Defendant Ensured Her Offending Speech Reached the Largest Possible Audience.**

41. In addition to her thousands of followers, Defendant often added "hashtags" to her posts including "#Lebanon," "#Monty," a nickname for Plaintiff, "#FinCenNews," utilized by those searching for financial news posts, and "#moneylaundering." *See, e.g.*, Exhibit A, at 5.

42. Adding hashtags to posts increases engagement and reach of a given post, because hashtags help the social media platform categorize the post and target audiences interested in specific subject matter.[1]

43. Defendant intentionally added hashtags to many of her offending posts within Exhibits A, B, and C in order to spread their reach to as many people as possible (including beyond her followers) and to help target the public who may be interested in Plaintiff, his companies, as well as Lebanese business and financial news. Because of Defendant's calculated post content, anyone searching social media for either Plaintiff or his companies would likely encounter Defendant's posts.

44. Furthermore, Defendant's defamation spread to countless unknown others through electronic communications, reposting, and through old fashioned in-person gossip mongering.

**G.     Defendant's Speech Damaged Plaintiff's Business and Personal Reputation.**

45. Beginning in April 2024 and continuing to the present, Plaintiff's business associates, colleagues, employees, and other individuals within his professional circle have mentioned or asked about Defendant's baseless allegations.

---

[1] *See, e.g.*, *Hashtags: What they are and how to use them effectively*, SPROUTSOCIAL: SPROUT BLOG (Mar. 16, 2023), https://sproutsocial.com/insights/what-is-hashtagging/.

46. In addition, Plaintiff has lost significant business opportunities as a direct result of Defendant's Offending Speech.

47. For example, in early 2024, a Middle Eastern government refused to issue a business license to one of Plaintiff's companies, citing the rumors of Plaintiff's alleged criminal activity that were created and circulated by Defendant. To date, that country has still refused to grant the referenced license due to the Offending Speech in Defendant's posts.

48. Also, in May 2024, a large telecommunications company retracted its invitation to Plaintiff's company to submit a Request for Proposal for a major project. The project was expected to produce between $50 and $60 million (USD) in revenue for the company awarded the contract.

49. That company cited "bad publicity on social media" as the reason for the retraction.

50. Lastly, since March 2024, multiple employees have resigned from Plaintiff's companies, citing Defendant's false allegations.

51. It was reasonably foreseeable to Defendant that some in the international business community would believe her posts about Plaintiff and in turn, refuse to do business with him and any of his companies. Indeed, that is precisely what happened.

52. Plaintiff has no way of knowing exactly how many people saw, read, considered, and/or believed Defendant's false statements made about him, nor can he truly assess the extent of reputational harm the Defendant intentionally caused by Defendant's Offending Speech.

**H.     Defendant's Speech Caused Plaintiff Severe Emotional Distress.**

53. Beginning in April 2024 and continuing to the present, Plaintiff's family, and extended family, and even his closest friends have mentioned or asked about the content of Defendant's posts. Put simply, Defendant's Offending Speech has infiltrated every corner of Plaintiff's life, both personal and professional.

54. The Offending Speech is so extreme, outrageous, methodological, and pervasive and so far outside the bounds of decency that no reasonable person in Plaintiff's shoes would be expected to endure it without suffering severely.

55. Defendant's actions have caused Plaintiff to suffer severe emotional distress, humiliation, embarrassment, and mental suffering.

56. As a direct result of Defendant's relentless defamation and online harassment, Plaintiff has personally experienced severe anxiety, sleeplessness, mood issues, and lessened appetite. In addition, Plaintiff has been forced to stand by and watch his immediate family, including his teenage children, suffer the effects of Defendant's conduct, further contributing to his personal emotional distress – as any father would.

57. Defendant's Offending Speech has also caused him to experience extreme mental distress and anxiety about the safety and security of his family, how his family and business associates view him following Defendant's lies, and his ability to continue to successfully manage and operate his companies.

## COUNT I
## DEFAMATION

58. Plaintiff incorporates the allegations of Paragraphs 1 through 57 as if fully restated herein.

59. Since March 2024, Defendant has engaged in a deliberate, systematic campaign to destroy Plaintiff personally and professionally by spreading lies, rumors, and other falsities across the internet on numerous social medial platforms.

60. Defendant's speech comprising the basis for Plaintiff's claim is attached as Exhibits A, B, and C. Those statements are incorporated by reference in full herein.

61. Specifically, Defendant made posts:

a. Stating Plaintiff defrauded his companies' and their affiliates' investors by misrepresenting the nature of his companies, and referred to his companies as "dummy" corporations in contrast to how those companies were represented to major investors;

b. Stating Plaintiff's companies are in severe financial distress, that they have an unserviceable level of debt, and have falsely reported profits to the detriment of the public and investors;

c. Stating Plaintiff is financially involved with the Iranian Revolutionary Guard, including stating Plaintiff "is the screen of the Iranian Guard . . . he is one of the businessmen [who] relied on . . . #money_laundering resulting from the cash economy" and Plaintiff is "benefit[ing] from #huge_loans from Islamic banks to #Iranian_Revolutionary_Guard in #the Gulf and he recorded these funds as 'profits' in #dummy_corporations in #Europe and Lebanon;" and,

d. Stating Plaintiff "is the screen of money laundering" for Lebanon's Prime Minister and accused Plaintiff of bank fraud and accepting "black money."

62. These statements were made by the Defendant.

63. These statements are false.

64. These statements are defamatory.

65. These statements were of or concerning Plaintiff.

66. These statements were published and/or transmitted to third parties.

67. These statements were seen and understood by such third parties.

68. These statements are accusations of serious and reprehensible criminal conduct and impute to Plaintiff the commission of a criminal offense involving moral turpitude, which, if true, could be indicted and punished.

69. These statements are accusations which impute to Plaintiff's unfitness to perform the duties of his employment and/or that Plaintiff cannot discharge the duties of his employment.

70. These statements prejudice Plaintiff in his profession.

71. These statements were published negligently, or with malicious intent, and with the purpose of smearing Plaintiff and damaging his personal and professional reputation, along with that of his businesses.

72. Defendant's publication of these statements severely impaired the Plaintiff's personal and professional reputations where he lives and works, resulting in damaged professional relationships, failed deals and lost opportunities, severe emotional distress, humiliation, embarrassment and mental suffering.

### COUNT II
### DEFAMATION *PER SE*

73. Plaintiff incorporates the allegations of Paragraphs 1 through 72 as if fully restated herein.

74. Since March 2024, Defendant engaged in a deliberate, systematic campaign to destroy Plaintiff personally and professionally by spreading lies, rumors, and other falsities across the internet on numerous social medial platforms.

75. Defendant's speech comprising the basis for Plaintiff's claim is attached as Exhibits A, B, and C. Those statements are incorporated by reference in full herein.

76. Specifically, Defendant made posts:

   a. Stating Plaintiff defrauded his companies' and their affiliates' investors by misrepresenting the nature of his companies, and referred to his companies as "dummy" corporations in contrast to how those companies were represented to major investors;

   b. Stating Plaintiff's companies are in severe financial distress, that they have an unserviceable level of debt, and have falsely reported profits to the detriment of the public and investors;

   c. Stating Plaintiff is financially involved with the Iranian Revolutionary Guard, including stating Plaintiff "is the screen of the Iranian Guard . . . he is one of the businessmen [who] relied on . . . #money_laundering resulting from the cash economy" and Plaintiff is "benefit[ing] from #huge_loans from Islamic banks

        to #Iranian_Revolutionary_Guard in #the Gulf and he recorded these funds as 'profits' in #dummy_corporations in #Europe and Lebanon;" and,

    d. Stating Plaintiff "is the screen of money laundering" for Lebanon's Prime Minister and accused Plaintiff of bank fraud and accepting "black money."

77. These statements were made by the Defendant.

78. These statements are false.

79. These statements are defamatory.

80. These statements were of or concerning Plaintiff.

81. These statements were published and/or transmitted to third parties.

82. These statements were seen and understood by such third parties.

83. These statements are accusations of serious and reprehensible criminal conduct and impute to Plaintiff the commission of a criminal offense involving moral turpitude, which, if true, could be indicted and punished.

84. These statements are accusations which impute to Plaintiff unfitness to perform the duties of his employment and/or that Plaintiff cannot discharge the duties of his employment.

85. These statements prejudice Plaintiff in his profession.

86. These statements were published negligently, or with malicious intent, and with the purpose of smearing Plaintiff and damaging his personal and professional reputation, along with that of his businesses.

87. As a result of these statements, Plaintiff has been injured

88. Defendant's publication of these statements severely impaired the Plaintiff's personal and professional reputations where he lives and works, resulting in damaged professional relationships, failed deals and lost opportunities, severe emotional distress, humiliation, embarrassment and mental suffering.

## COUNT III
## <u>INSULTING WORDS</u>

89. Plaintiff incorporates the allegations of Paragraphs 1 through 88 as if fully restated herein.

90. Since March 2024, Defendant engaged in a deliberate, systematic campaign to destroy Plaintiff personally and professionally by spreading lies, rumors, and other falsehoods across the internet on numerous social medial platforms.

91. Defendant's speech comprising the basis for Plaintiff's claim is attached as Exhibits A, B, and C. Those statements are incorporated by reference in full herein.

92. Specifically, Defendant made posts:

   a. Stating Plaintiff defrauded his companies' and their affiliates' investors by misrepresenting the nature of his companies, and referred to his companies as "dummy" corporations in contrast to how those companies were represented to major investors;

   b. Stating Plaintiff's companies are in severe financial distress, that they have an unserviceable level of debt, and have falsely reported profits to the detriment of the public and investors;

   c. Stating Plaintiff is financially involved with the Iranian Revolutionary Guard, including stating Plaintiff "is the screen of the Iranian Guard . . . he is one of the businessmen [who] relied on . . . #money_laundering resulting from the cash economy" and Plaintiff is "benefit[ing] from #huge_loans from Islamic banks to #Iranian_Revolutionary_Guard in #the Gulf and he recorded these funds as 'profits' in #dummy_corporations in #Europe and Lebanon;" and,

   d. Stating Plaintiff "is the screen of money laundering" for Lebanon's Prime Minister and accused Plaintiff of bank fraud and accepting "black money."

93. These statements were made by the Defendant.

94. These statements are false and defamatory.

95. In addition to these statements, Defendant also posted Plaintiff's real time location and tracking information, including the aircraft identification number of his personal plane.

96. These statements, coupled with Plaintiff's real time location and tracking information, amounted to offering Plaintiff up to Defendant's followers for them to seek justice.

97. Defendant did so knowing such statements and locations could lead to violence and/or a breach of the peace.

98. By posting these statements alongside Plaintiff's real time location, Defendant's statements were sufficiently offensive to tend to violence and/or a breach of the peace.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

99. Plaintiff incorporates the allegations of Paragraphs 1 through 98 as if fully restated herein.

100. Since March 2024, Defendant has engaged in a deliberate, intentional campaign to inflict emotional distress upon Plaintiff.

101. Defendant has repeatedly made false and defamatory statements regarding Plaintiff, while either knowing such statements were false, or with reckless disregard as to their truth or falsity.

102. Defendant knew, or should have known, that such false and defamatory statements would result in severe emotional distress to Plaintiff.

103. Defendant's conduct was extreme, outrageous, methodological, and pervasive such that no reasonable person in Plaintiff's position would be expected to endure it without suffering severely and offends the generally accepted standards of decency and morality.

104. Defendant's constant, public onslaught of lies is intolerable; specifically, her decision to post false statements online so many times about Plaintiff without a shred of evidence is atrocious.

105. As a direct result of Defendant's relentless defamation and harassment, Plaintiff has experienced severe anxiety, sleeplessness, mood issues, and lessened appetite. He is concerned about the added threats to his family, how his family views him following Defendant's lies, and his ability to continue to successfully manage his companies.

106. In addition, Plaintiff has been forced to stand by and watch his immediate family, including his teenage children, suffer the effects of Defendant's conduct, further contributing to his personal emotional distress.

107. Plaintiff has suffered and continues to suffer severe emotional distress as a direct result of Defendant's defamatory and false statements.

**WHEREFORE**, the Plaintiff, Mountasser Hachem, prays that a judgment be entered against the Defendant, Nadine Barakat, in an amount no less than Two Million Five Hundred Thousand Dollars ($2,500,000.00) in compensable damages, as well as exemplary damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) for her willful, reckless, and vindictive disregard Plaintiff's emotional and physical well-being, his reputation, and the foreseeable impact her conduct has had on Plaintiff as a respected and upstanding member of the community, along with all other relief that this Court deems appropriate and just under the circumstances.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Dated: July 12, 2024                    **Respectfully submitted,**

**MOUNTASSER HACHEM**

By: */s/ C. Dewayne Lonas*
C. Dewayne Lonas, Esq. (VSB No. 44298)
Ashley A. Davoli, Esq. (VSB No. 93466)
Moran Reeves & Conn PC
1211 E. Cary Street
Richmond, Virginia 23219
Telephone:  (804) 864-4820
Facsimile:  (804) 421-6251
dlonas@moranreevesconn.com
adavoli@moranreevesconn.com


Max B. Goodman, Esq. (IL Bar No. 6312919)
*Pro hac vice* application forthcoming
Amundsen Davis, LLC
150 North Michigan Avenue, Suite #3300
Chicago, Illinois 60601
Telephone: (312) 894-3282
mgoodman@amundsendavislaw.com

*Counsel for Plaintiff Mountasser Hachem*